Opinion issued August 25, 2015



In The

# Court of Appeals

For The

## First District of Texas

————————————

## NO. 01-14-00776-CV

————————————

### SCHLUMBERGER LIMITED AND SCHLUMBERGER TECHNOLOGY CORPORATION, Appellants / Cross-Appellees

### V.

### CHARLOTTE RUTHERFORD, Appellee / Cross-Appellant

On Appeal from the 127th District Court
Harris County, Texas
Trial Court Case No. 2014-13621

## O P I N I O N

In this interlocutory appeal and cross-appeal, the parties challenge various portions of the trial court's order granting in part and denying in part a motion to dismiss under the Texas Citizen's Participation Act (TCPA), Chapter 27 of the

Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE §§ 27.001–.011. Because we have no jurisdiction over an interlocutory appeal of the portion of the order granting the motion to dismiss, we dismiss the appeal by Schlumberger Limited and Schlumberger Technology Corporation. We affirm the portion of the order denying Rutherford's motion to dismiss the breach-of-contract claim against her.

## Background

In 2006, Schlumberger hired Charlotte Rutherford as an attorney, with the title of Manager of Intellectual Property Enforcement.[1] In 2009, it promoted her to Deputy General Counsel for Intellectual Property.

When she was hired, Rutherford executed a "Patent and Confidential Information Agreement." That agreement prohibited her from removing Schlumberger's property, including equipment, computer software, and reports, from the company's facilities except as may have been required in performing her duties. It also provided that because of the position of trust and confidence Rutherford was being given, she would be entrusted with Schlumberger's valuable trade secrets and other confidential information. The agreement prohibited

---

[1] When she was hired, Rutherford was known as Charlotte Copperthite. For purposes of this interlocutory appeal, all parties have referred generally to the appellants collectively as "Schlumberger." The precise relationship as it relates to the two distinct Schlumberger entities does not appear to be material to any of the issues we address in this opinion.

Rutherford from disclosing such information to third parties or using it for reasons other than Schlumberger business. It also prohibited her from competing with Schlumberger for a period of one year following the termination of her employment. Schlumberger's internal policies, including its "Code of Conduct," "Confidentiality and Information Security Policy," and "Inventions Ownership and Confidential Information Policy" imposed similar restrictions and prohibitions.

It is undisputed that in the course of her work, Rutherford had access to Schlumberger's business information, including intellectual property, proprietary technologies, competitive strategies, marketing strategies, and financial information. Schlumberger considered some of that information to be trade secrets. The information available to Rutherford included information regarding Schlumberger's Petrel software and intellectual property strategies regarding that software.[2] For example, in 2006 Rutherford assisted Schlumberger in developing strategies for litigation against Geomodeling Technology Corporation over alleged misuse of the Petrel software. Among other activities in that case, she presented evidence to a Canadian court.

---

[2]     Neither the parties' briefs nor the record makes the exact nature of Petrel clear. Based on the record before us, we understand it to be software that Schlumberger offered to its clients or customers to assist them in tasks related to exploration for and production of oil and gas.

In May 2013, Rutherford left Schlumberger. As part of the exit process, Schlumberger collected company information, documents, and devices in Rutherford's possession, conducted an exit interview, and had her sign an "Employee Exit Checklist" certifying that she had returned all company property and information. Rutherford gave Schlumberger employee Robin Nava a USB flash drive containing Schlumberger information, including a file named "SIS-DCS IP Strategy Review -- Update (Oct-2012).pptx" and accessed by the user "crutherford2." The drive also held a number of files that Schlumberger contends contain trade secrets and other confidential information. Rutherford did not leave any other documents, hard drives, or flash drives in her office except for one flash drive still in its original, unopened packaging.

On her departure from Schlumberger, Rutherford joined Acacia Research Group, a patent-licensing firm. Acacia's business model involves acquiring patents, which it then monetizes by suing companies that it alleges infringe upon the patents, or issuing licenses to them. Factors Acacia considers when determining whether to acquire a patent include potential targets for licensing or litigation.

Several weeks after her departure from Schlumberger, Rutherford met with representatives of a third party, Austin Geomodeling, regarding Acacia's potential acquisition of one of its patents, United States Patent No. 7,986,319, which covers a "Method and System for Dynamic Three-Dimensional Geological Interpretation

4

and Modeling." Both outside and in-house legal counsel recommended to Acacia that it acquire the '319 patent. Rutherford testified that her "involvement was to concur with the recommendation to acquire the '319 patent."

Acacia subsequently acquired the '319 patent and transferred it to a subsidiary, Dynamic 3D Geosolutions. Approximately nine months after Rutherford left Schlumberger, Dynamic 3D sued Schlumberger for infringing the '319 patent. According to Rutherford, "the decision to acquire and the decision to sue" were "part of the same review process," and she "concurred with the recommendations of my counsel" in both decisions.

Schlumberger suspected that Rutherford had some involvement in the Dynamic 3D lawsuit. It investigated the circumstances of Rutherford's departure and discovered that it could not account for an external hard drive she had used. Schlumberger also had a forensic expert examine her computer, and he determined that Rutherford had connected a number of USB flash drives to her computer after accepting her job with Acacia, in addition to the one that she gave to Nava. The forensic expert found evidence that Rutherford copied to those drives files belonging to Schlumberger, at least some of which allegedly contain confidential and trade-secret information. The analysis also showed that, prior to her departure, Rutherford deleted a number of files from her computer. Although Rutherford testified that she found additional thumb drives in her office at Schlumberger and

5

placed them in the inbox of Schlumberger employee Janet Lennon, other evidence suggested that Lennon does not have an inbox, Rutherford's inbox and outbox were empty when she left Schlumberger, and Lennon did not find any additional drives in Rutherford's office after her departure.

In 2014, Schlumberger sued Rutherford for breach of contract, misappropriation of trade secrets, conversion, breach of fiduciary duty, and violation of the Texas Theft Liability Act. Rutherford timely moved to dismiss all of Schlumberger's claims under the TCPA. In her motion, she argued that dismissal was proper because Schlumberger's suit "is based on, relates to, or is in response to" her "protected acts" in exercising her rights to petition and to freely associate. *See* TEX. CIV. PRAC. & REM. CODE §§ 27.001–.003. She asserted in the motion that Schlumberger sued her only for reasons of "revenge," "scare tactics," and "to intimidate her." She also maintained that the allegations were "false," based on a "misperception," a "mystery tale" supported by "sham affidavits" and by a "half-baked" and "rigged 'investigation,'" and driven by the desire to "[p]unish [her] for associating with Dynamic 3D and, in Schlumberger's mind, participating in a lawsuit."

After a hearing, the trial court dismissed the misappropriation, conversion, breach of fiduciary duty, and Texas Theft Liability Act claims, but it denied the motion to dismiss with respect to the claim for breach of contract. Schlumberger

appeals, challenging the trial court's partial grant of the TCPA motion to dismiss, and Rutherford cross-appeals, challenging the partial denial of that motion.

## Analysis

### I.     Schlumberger's interlocutory appeal

Schlumberger presents four issues on appeal, all of which constitute interlocutory attacks on the trial court's order to the extent it partially granted Rutherford's TCPA motion to dismiss.[3] Rutherford responds that we lack jurisdiction over Schlumberger's appeal because no statute confers jurisdiction over the interlocutory grant of a TCPA motion to dismiss.

In general, Texas appellate courts have jurisdiction only over final judgments. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 92 (Tex. 2012). An exception to this rule exists, however, when a statute authorizes an interlocutory appeal. *CMH Homes v. Perez*, 340 S.W.3d 444, 447 (Tex. 2011). We must "strictly apply statutes granting interlocutory appeals because they are a narrow exception to the general rule that interlocutory orders are not immediately appealable." *Id.*; *see also Schlumberger Tech. Corp. v. Baker Hughes Inc.*, 355 S.W.3d 791, 796

---

[3]     The issues address whether: (1) the TCPA applies to Schlumberger's dismissed claims; (2) the trial court could consider circumstantial evidence in determining whether Schlumberger established a prima facie case for each of its claims; (3) Schlumberger established a prima facie case; and (4) the trial court abused its discretion in making its award of sanctions and attorney's fees to Rutherford.

(Tex. App.—Houston [1st Dist.] 2011, no pet.). This policy is a corollary of the well-established policy of favoring final resolution on the merits of the case over resolution of preliminary orders. "Generally the most expeditious way of obviating the hardship and discomforture of an unfavorable preliminary order is to try the case on its merits and thus secure a hearing wherein the case may be fully developed and the courts, both trial and appellate, may render judgments finally disposing of controversies." *Sw. Weather Research, Inc. v. Jones*, 327 S.W.2d 417, 422 (Tex. 1959).

The Civil Practice and Remedies Code provides for interlocutory appeal of an order that "denies a motion to dismiss filed under Section 27.003." TEX. CIV. PRAC. & REM. CODE § 51.014(a)(12). Until this provision's enactment in 2013, the only statute explicitly providing for interlocutory appeals related to TCPA motions was Section 27.008(a) of the Civil Practice and Remedies Code, providing that the moving party could appeal when a TCPA motion to dismiss was denied by operation of law. *See* TEX. CIV. PRAC. & REM. CODE § 27.008(a). The courts of appeals disagreed whether a party could also bring an interlocutory appeal from a trial court's order on such a motion. *See generally Paulsen v. Yarrell*, 455 S.W.3d 192 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Kinney v. BCG Attorney Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at *3 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op.); *see also Jennings v. WallBuilder*

*Presentations, Inc. ex rel. Barton*, 378 S.W.3d 519, 528 (Tex. App.—Fort Worth 2012, pet. denied) ("construing section 27.008 with precision and with fidelity to the terms by which the legislature has expressed its wishes, we decline to 'imply' into the statute . . . a right of interlocutory appeal from a timely-signed order denying a timely-filed chapter 27 motion to dismiss"). The Legislature enacted Section 51.014(a)(12), evidently to resolve this split in authority, and the law now expressly permits an interlocutory appeal of an order denying a TCPA motion to dismiss. Act of May 24, 2013, 83d Leg. R.S., ch. 1042, § 4, 2013 Tex. Sess. Law Serv. 2501, 2502 (codified at TEX. CIV. PRAC. & REM. CODE § 51.014(a)(12)); *see also Paulsen*, 455 S.W.3d at 195. By contrast, no statute expressly provides for interlocutory appeal of an order that grants such a motion.

Schlumberger argues in its reply brief that "Section 27.008(b) provides for appeals from orders on TCPA motions to dismiss without regard for whether an order is a grant or denial." We disagree. That statute provides that "[a]n appellate court shall expedite an appeal or other writ, whether interlocutory or not, from a trial court order on a motion to dismiss a legal action under Section 27.003 or from a trial court's failure to rule on that motion in the time prescribed by Section 27.005." TEX. CIV. PRAC. & REM. CODE § 27.008(b). It does not expressly confer a right to interlocutory appeal. Rather, it provides that the courts of appeals must expedite those appeals which are taken from an order on a Section 27.003 motion

or the trial court's failure to act on such a motion. *See id.* By contrast, Section 27.008(a) provides that "the moving party may appeal" when a Section 27.003 motion to dismiss is denied by operation of law, and Section 51.014(a)(12) provides for appeal of an interlocutory order that "denies" such a motion. *Id.* §§ 27.008(a), 51.014(a)(12). Under Section 27.008(b), both of these types of appeals must be expedited.

Schlumberger presents several arguments against this reading of the statute authorizing interlocutory appeals under the TCPA.

## A. Textual analysis of Sections 27.008(b) and 51.014(a)(12)

Schlumberger argues that our interpretation of the TCPA requires us to "read an implied modification of Section 27.008(b) into Section 51.014(a)(12)," narrowing the scope of the former by resort to the latter. According to Schlumberger, such a reading "would be contrary to the express intent" of the Legislature in enacting both provisions. But neither provision reflects an "express intent" to allow appeals from interlocutory orders granting a TCPA motion to dismiss. Our interpretive task does not require us to scrutinize Section 27.008(b) in isolation, without reference to the remainder of the TCPA or other statutes authorizing interlocutory appeals, to determine what Section 27.008(b) hypothetically might have meant before the enactment of Section 51.014(a)(12). To put it another way, to the extent that Schlumberger asks us to infer a right to

10

TCPA interlocutory appeals that is not expressly provided in Section 27.008(b), the enactment of Section 51.014(a)(12), with its express limitation of the scope of appeals available from interlocutory orders on TCPA motions to dismiss, prevents us from inferring a right of interlocutory appeal that would substantively expand Section 51.014(a)(12) beyond its express limitation. To do so would ignore and render ineffective the Legislature's presumably deliberate choice of words limiting interlocutory appeals to orders denying a TCPA motion to dismiss. Because we must "strictly apply statutes granting interlocutory appeals" as "a narrow exception to the general rule" permitting appeals only from a final judgment, we must reject Schlumberger's interpretation. *CMH Homes*, 340 S.W.3d at 447; *Bally Total Fitness Corp. v. Jackson*, 53 S.W.3d 352, 355 (Tex. 2001).

## B.  Legislative history of Section 51.014(a)(12)

In its reply brief and in its oral argument, Schlumberger also seeks validation for its proposed interpretation from legislative history in the form of a bill analysis attributed to a legislative sponsor. *See* Senate Comm. on State Affairs, Engrossed Bill Analysis, Tex. H.B. 2935, 83d Leg., R.S. (2013). Schlumberger argues that this "legislative history confirms that (1) the intent of the TCPA was to allow appeals from both grants and denials of TCPA motions to dismiss, and (2) the amendment to Section 51.014 did not alter the TCPA in that regard." Schlumberger thus proposes that we "should not read an implied modification of

Section 27.008(b) into Section 51.014(a)(12)" because "doing so would be contrary to the express intent of the author of both provisions."

There are legitimate purposes for courts to reference legislative history in the course of explaining the evolution of a statute. *See, e.g.*, *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 437 (Tex. 2011) (Jefferson, C.J., concurring); *id.* at 439 (Willett, J., concurring). But our Supreme Court has consistently counseled against resort to legislative history as an interpretative tool for statutes that can be understood without departing from the enacted text. The Court has maintained this methodological approach despite the fact that the Legislature arguably has invited courts to mine the annals of legislative history as inspiration for adventures in statutory interpretation. *See, e.g.*, TEX. GOV'T CODE § 311.023(3). Texas courts wisely have declined that approach.

When it comes to explaining the standards for how statutes will be interpreted by courts, the courts have their own say in the matter. And the Supreme Court of Texas generally recognizes that resort to legislative history to supplement or, worse, to contradict the express text invokes a risk of inappropriately displacing the Legislature from its role and responsibility of passing laws by substituting the policy preferences of the judges. It the task of courts to interpret and implement laws as written, not as they could have been written, and not as the judges might see fit if the Texas Constitution permitted courts to act as a post-legislative

committee of statutory revision. The Constitution is clear in its disapproval of judicial assumption of the legislative role. *See* TEX. CONST. art. II, § 1; *see also Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 464 (Tex. 2009) (Willett, J., concurring) ("Our place in the constitutional architecture requires fidelity to what lawmakers actually passed.").

Thus our Supreme Court has acknowledged that despite the Legislature's purported acquiescence to the liberal use of legislative history, "over-reliance on secondary materials should be avoided, particularly where a statute's language is clear. If the text is unambiguous, we must take the Legislature at its word and not rummage around in legislative minutiae." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 652 n.4 (Tex. 2006); *see also Entergy Gulf States*, 282 S.W.3d at 463 (Willett, J., concurring) ("the 'surest guide' to what lawmakers intended is what lawmakers enacted"). For example, when a bill sponsor's press release and an exchange between two state senators in reference to a conference committee report were quoted in dissent as purported evidence of "legislative intent," a 7-justice majority of the Supreme Court was emphatic in its rejection of this approach and in its clear explanation why:

> In support of their arguments . . . Molinet and the dissent urge us to consider and give overriding weight to statements made by a senator during floor debates and published by unanimous consent in the Senate Journal. We decline to do so. Statements made during the legislative process by individual legislators or even a unanimous legislative chamber are not evidence of the collective intent of the

13

majorities of both legislative chambers that enacted a statute. *See Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 923 (Tex. 1993). Moreover, the Legislature expresses its intent by the words it enacts and declares to be the law. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006) ("Ordinarily, the truest manifestation of what legislators intended is what lawmakers enacted, the literal text they voted on."). Construing clear and unambiguous statutes according to the language actually enacted and published as law—instead of according to statements that did not pass through the law-making processes, were not enacted, and are not published as law—ensures that ordinary citizens are able to rely on the language of a statute to mean what it says. *See Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.2d 864, 866 (Tex. 1999). When a statute's language is clear and unambiguous "'it is inappropriate to resort to the rules of construction or extrinsic aids to construe the language.'" *Tex. Lottery Comm'n [v. First State Bank of DeQueen]*, 325 S.W.3d [628,] 637 [(Tex. 2010)] (quoting *City of Rockwall [v. Hughes]*, 246 S.W.3d [621,] 626 [(Tex. 2008)]); *Tex. Dep't of Protective and Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 177 (Tex. 2004); *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 505 (Tex. 1997).

It is the Legislature's prerogative to enact statutes; it is the judiciary's responsibility to interpret those statutes according to the language the Legislature used, absent a context indicating a different meaning or the result of the plain meaning of the language yielding absurd or nonsensical results. *See* TEX. GOV'T CODE § 311.011(a) (words and phrases shall be read in context and construed according to rules of grammar and common usage); *Tex. Lottery Comm'n*, 325 S.W.3d at 637–38. . . .

*Molinet v. Kimbrell*, 356 S.W.3d 407, 414–15 (Tex. 2011).

As applied in this particular case, this court has previously considered and rejected the precise argument now advanced based on legislative history, although Schlumberger characterizes it as "dicta." We explained in *Paulsen v. Yarrell*, 455 S.W.3d 192 (Tex. App.—Houston [1st Dist.] 2014, no pet.), that the bill sponsor's

statement relied upon by Schlumberger "actually contradicts the text of the statute by indicating the bill sponsor's 'statement of intent' to include interlocutory appeals from 'the denial or grant' of motions to dismiss . . . despite the fact that the enacted legislation, Section 51.014(a)(12), is expressly limited by its terms to authorizing review of an order that 'denies a motion to dismiss.'" *Paulsen*, 455 S.W.3d at 196. Bottom line: the bill sponsor's stated intent doesn't match the law the Legislature passed and the Governor signed into law. *See Klein v. Hernandez ex rel. N.H.*, 315 S.W.3d 1, 11 (Tex. 2010) (Willett, J., concurring) ("The Legislature passes and the Governor signs bills, not bill analyses, and we are governed by laws, not by legislative histories."). So Schlumberger's argument invites us to substitute the bill sponsor's original intent and the bill that was originally proposed for the legislation that was actually passed into law. It is a textbook example of the danger of reliance on legislative history, and we once again decline the invitation.

### C.    Effect of order partially denying a TCPA motion to dismiss

Finally, Schlumberger argues that we have jurisdiction over the trial court's entire order because that order partially denied Rutherford's motion. According to Schlumberger, the entire order therefore falls within the scope of Section 51.014(a)(12) as "an interlocutory order . . . that . . . denies a motion to dismiss filed under Section 27.003."

15

Section 51.014(a)(12) expressly grants a right of interlocutory appeal from an order that denies a motion to dismiss filed under Section 27.003. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(12). It does not mention orders that grant a motion to dismiss filed under Section 27.003.

The statute does not explicitly address the circumstance of a written "interlocutory order" that partially denies and partially grants a motion to dismiss filed under Section 27.003. To the extent a party appeals from the part of such an order that denies the motion to dismiss, the statute applies and permits an interlocutory appeal. But does the authority to appeal from an interlocutory order that "denies a motion to dismiss filed under Section 27.003" also permit an appeal from such an order to the extent that it also partially grants the motion to dismiss?

Schlumberger's argument assumes that the trial court's interlocutory ruling that partially granted Rutherford's TCPA motion to dismiss is an appealable component of one "interlocutory order" that also "denies a motion to dismiss filed under Section 27.003." But the statute's reference to an "interlocutory order" also could be understood as a specific interlocutory ruling, as opposed to a document containing multiple interlocutory rulings. *Garner's Dictionary of Legal Usage* defines "order" as follows:

> (1) a command or direction; (2) a judge's written direction; or (3) a written instrument (such as a check), made by one person and addressed to another, directing that other to pay money or deliver something to someone named in the instrument. In sense 2, a court's

> order may be either interlocutory (on some intermediate matter) or, more broadly, final (and therefore dispositive of the entire case).

Bryan A. Garner, *Garner's Dictionary of Legal Usage* 640 (3d ed. 2011). *Black's Law Dictionary* defines "interlocutory order" as "[a]n order that relates to some intermediate matter in the case; any order other than a final order." *Black's Law Dictionary* 1271 (10th ed. 2014).

Applying "interlocutory order" as a reference to a specific ruling is consistent with the courts' general approach of "strictly" applying statutory authorizations of interlocutory appeals as narrow exceptions to the general rule disallowing interlocutory appeals. *CMH Homes*, 340 S.W.3d at 447. This construction also has the benefit of making the right of interlocutory appeal hinge entirely on the substance of the interlocutory order—as the Legislature provided by delineating the specific types of interlocutory rulings that are eligible for interlocutory appeals—rather than the form in which the trial court issues its ruling. Were we to accept Schlumberger's interpretation, trial courts could insulate partial grants of TCPA motions to dismiss from interlocutory review simply by issuing them as standalone written orders, separate from any other written order that partially denies the motion. Such an interpretation would elevate form over substance in a way that is not consistent with the text and structure of the statute.

Our interpretation of Section 51.014(a)(12) is consistent with the application of Section 51.014(a)(6) in analogous circumstances. *See, e.g.*, *KTRK Television,*

*Inc. v. Fowkes*, 981 S.W.2d 779, 786–87 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (refusing to apply Section 51.014(a)(6) to allow libel plaintiff to appeal from portions of an interlocutory order partially granting and partially denying media defendant's motion for summary judgment), *disapproved on other grounds by Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115–16 (Tex. 2000); *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 627–28 (Tex. App.—Fort Worth 2007, pet. denied) (limiting scope of interlocutory review under Section 51.014(a)(6) to portion of order denying summary judgment on claims defended on free-speech grounds, and not other parts of same order).

Schlumberger relies on *Dolcefino v. Randolph*, No. 14-00-00602-CV, 2001 WL 931112 (Tex. App.—Houston [14th Dist.] Aug. 16, 2001, pet. denied) (not designated for publication), as authority for the opposite conclusion that Section 51.014(a)(6) bestows interlocutory appellate jurisdiction "over the entire order denying appellants' motions for summary judgment." *See Dolcefino*, 2001 WL 931112, at *3. *Dolcefino* is from another court, and it has no precedential value. TEX. R. APP. P. 47.7. Schlumberger also directs our attention to *Kinney v. BCG Attorney Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012 (Tex. App.—Austin Apr. 11, 2014, pet. denied) (mem. op.), as an example of a court of appeals exercising appellate jurisdiction to review the partial grant of a TCPA motion to dismiss. But the *Kinney* court did not analyze the jurisdiction question presented by

18

this appeal. For the reasons explained above, we decline to follow both *Dolcefino* and *Kinney*.

We conclude that the denial of a motion to dismiss does not provide an avenue of interlocutory appeal to all other ancillary rulings contained within the same written "interlocutory order." We therefore dismiss Schlumberger's appeal from the partial grant of Rutherford's motion to dismiss for want of jurisdiction.

## II. Rutherford's cross-appeal

In her cross-appeal, Rutherford argues that the trial court erred in denying her motion to dismiss as to Schlumberger's claim for breach of contract. She contends that the contract claim falls within the scope of the TCPA and that Schlumberger failed to adduce clear and specific evidence to support each element of the claim. In response, Schlumberger argues that the TCPA does not apply to the communications in question and, even if it did, its evidentiary burden to establish a prima facie case on the contract claim was satisfied. For this interlocutory appeal, we will assume without deciding that the TCPA applies because we agree with Schlumberger that it established a prima facie case as to its breach-of-contract claim.

The TCPA provides for dismissal of meritless claims that are based on the defendant's exercise of the rights of free speech, petition, or association, as defined within the statute. TEX. CIV. PRAC. & REM. CODE § 27.003. "If a legal action is

19

based on, relates to, or is in response to a party's exercise of" those rights, "that party may file a motion to dismiss the legal action." *Id.* § 27.003(a). The stated purpose of the TCPA "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *Id.* § 27.002.

To obtain dismissal under the TCPA, a movant must show "by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the party's exercise of (1) the right of free speech; (2) the right to petition; or (3) the right of association." *Id.* § 27.005(b). If the movant meets this burden, then the burden shifts to the plaintiff to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). In deciding whether to grant a motion under the TCPA and dismiss the lawsuit, a trial court will "consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." *Id.* § 27.006(a).

The Supreme Court of Texas recently clarified that, in the context of the TCPA, "prima facie case" means "evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *In re Lipsky*, 460 S.W.3d

20

579, 590 (Tex. 2015). The evidence of a prima facie case must also be "clear and specific." TEX. CIV. PRAC. & REM. CODE § 27.005(c). "[P]leadings that might suffice in a case that does not implicate the TCPA may not be sufficient to satisfy the TCPA's 'clear and specific evidence' requirement." *In re Lipsky*, 460 S.W.3d at 590. As a result, "mere notice pleading—that is, general allegations that merely recite the elements of a cause of action—will not suffice." *Id.* at 590–91. "Instead, a plaintiff must provide enough detail to show the factual basis for its claim." *Id.* at 591. Such evidence may be direct or circumstantial, as the TCPA "does not impose a higher burden of proof than that required of the plaintiff at trial." *Id.*

"We review de novo a trial court's ruling on a motion to dismiss under the TCPA," including whether "the nonmovant satisfied the burden imposed by section 27.005(c)." *United Food & Commercial Workers Int'l Union v. Wal-Mart Stores, Inc.*, 430 S.W.3d 508, 511 (Tex. App.—Fort Worth 2014, no pet.); *see also In re J.K.B.*, 439 S.W.3d 442, 450 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("Because a determination of whether a party has presented prima facie proof of a meritorious claim is a question of law, we review the trial court's decision of this issue de novo."). In conducting this review, we examine the pleadings and the evidence to determine whether the nonmovant marshaled "clear and specific" evidence to support each alleged element of its cause of action. *See Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 355

21

(Tex. App.—Houston [1st Dist.] 2013, pet. denied). "We review the pleadings and evidence in a light favorable to" the nonmovant. *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 80–81 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

"The essential elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach." *CCC Grp., Inc. v. S. Cent. Cement, Ltd.*, 450 S.W.3d 191, 196 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (quoting *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). Accordingly, we must evaluate the evidence presented by Schlumberger to determine whether the trial court correctly determined it to be sufficiently clear and specific as to each element of the contract claim.

## A.     Existence of a valid contract

Schlumberger adduced sufficient evidence to support the first element of its breach-of-contract claim: that the parties entered into a valid contract. The parties agree that the Patent and Confidential Information Agreement between Rutherford and Schlumberger Limited was a valid contract. Schlumberger attached a copy of this agreement to its response to Rutherford's TCPA motion to dismiss.

## B. Performance by Schlumberger

Schlumberger also adduced prima facie evidence that it performed its obligations under the Patent and Confidential Information Agreement, satisfying the second element of its contract claim. In the agreement, Rutherford agreed to certain obligations regarding Schlumberger patents and confidential information, "[i]n consideration of [Schlumberger Limited's] employment or continued employment of [Rutherford] and the payment of a salary or other remuneration." Rutherford admits that she was employed by Schlumberger from 2006 until 2013.

## C. Breach by Rutherford

With respect to Rutherford's alleged breach of the agreement—the third element of the breach-of-contract claim—Schlumberger also adduced some evidence in support of its case. Schlumberger alleges that Rutherford breached her agreement by removing or failing to return "records, data, equipment, notes, reports, and other material from Schlumberger's premises" and by "retaining Schlumberger confidential information and trade secrets after her employment ended." As evidentiary support, Schlumberger adduced testimony by its information technology employee Gary DeLeon, who testified that Rutherford had an external hard drive issued by the company. Nava testified that Rutherford failed to return that drive before her departure, and Schlumberger has been unable to account for it.

Schlumberger also adduced the affidavit of a forensic expert, David Cowen, who testified that, based on his examination, "at least eight different USB flash drives [were] attached" to two Schlumberger computers between February 1, 2013 and May 30, 2013, while the user "crutherford2" was logged in on those machines. Cowen also testified that "forensic artifacts" known as "ShellBags" and related to those drives showed that the flash drives contained a number of directories, and at least three of the drives contained directories named "IP Strategy Presentation" and "IP Strategy." At least one drive, a SanDisk U3 Cruzer flash drive attached to one of these computers by "crutherford2," contained directories named "Acacia Disability," "Acacia," "IP Strategy Presentation," "IP Strategy," "Sent to Acacia," and "Sent to Outside Counsel (Todd)." Another drive, an Imation Nano Pro flash drive, contained a file named "SIS-DCS IP Strategy Review -- UPDATE (Oct-2012).pptx." Nava testified that she was familiar with and had reviewed that file and that it contained information that Schlumberger treats as confidential, privileged, and trade secrets, including information about Petrel and its development. Nava and Lennon testified that Schlumberger has been unable to account for any of the USB flash drives connected to Rutherford's computer, with the exception of the single drive that Rutherford gave to Nava before her departure from Schlumberger.

Further, Schlumberger presented evidence, in the form of Cowen's affidavit, that Rutherford deleted at least 123 files from her Schlumberger-issued computer before her resignation. Among these were files with the following names:

- IP Strategy Review.pptx
- IP Strategy Review - Well Services.pptx
- Schlumberger Risk Assessment - IP.xlsx
- Petrel Bulletin Board.doc
- Petrel
- Goldstar Patent Application Template (for (Petrel).doc
- Petrel Goldstar Map.ppt
- Petrel Strategy Map w Stars (3).doc
- Petrel Strategy Map w Stars (3).rtf
- Petrel Strategy Map w Stars (test1).doc
- Petrel Strategy Map w Stars.doc

Cowen's analysis showed that many of these files had been deleted both from folders on Rutherford's computer and from the "Recycle Bin" on her computer.

Our inquiry in this interlocutory appeal is limited to examining the pleadings and the evidence to determine whether Schlumberger marshaled "clear and specific" evidence to support each alleged element of its cause of action. *See Newspaper Holdings*, 416 S.W.3d at 80. We conduct that review "in a light favorable to" Schlumberger as the nonmovant. *Id.* And while the evidence must be "clear and specific," the TCPA "does not impose a higher burden of proof than that required of the plaintiff at trial." *In re Lipsky*, 460 S.W.3d at 591. For Schlumberger's breach-of-contract claim to survive dismissal, the TCPA requires

only that the evidence be "clear," "specific," and "sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Id.* at 590.

In the context of this interlocutory appeal, two alleged facts relevant to the third element of Schlumberger's breach-of-contract claim are at issue: whether Rutherford removed, destroyed, or otherwise failed to return "records, data, equipment, notes, reports, and other material," and whether she "retain[ed] Schlumberger confidential information and trade secrets after her employment ended." This interlocutory appeal does not require us to determine the qualifications of any witness or the significance of the names given to any computer files or directories. We have referenced particular pieces of evidence, such as file names, merely by way of example. We need not determine whether any particular file or computer directory actually represents or contains confidential information or trade secrets. We express no opinion as to such matters. We simply hold that the evidence presented by Schlumberger, taken in the light most favorable to Schlumberger, is sufficient to establish a prima facie case that Rutherford breached her Patent and Confidential Information Agreement.

### D. Damages

With respect to the damages element of the breach-of-contract claim, Schlumberger requests actual damages for Rutherford's alleged breach of the

Patent and Confidential Information Agreement.[4] In addition, Nava testified that "Schlumberger has spent millions of dollars developing the SIS/Petrel technology" and "many millions more developing its other confidential, proprietary technologies, applications, and products." Schlumberger contends that the value of these investments is diminished by Rutherford's alleged disclosure of its confidential information and trade secrets.

In addition to damages, Schlumberger seeks permanent injunctive relief in the form of an order compelling Rutherford "to return all Schlumberger property, documents, materials, information, and files, whether physical or electronic, to Schlumberger, including all hard drives and USB flash drives, and not to use or disclose any Schlumberger proprietary, confidential, trade secret, or privileged information." That is, it seeks specific performance of the agreement. "Specific performance is not a separate cause of action, but rather it is an equitable remedy used as a substitute for monetary damages when such damages would not be adequate." *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied); *see also Luccia v. Ross*, 274 S.W.3d 140, 146 (Tex.

---

[4]     At the hearing on Rutherford's motion to dismiss and at oral argument in this appeal, counsel for Schlumberger argued that the damages for Rutherford's breach of contract included the value of at least eight flash drives, the external hard drive that Rutherford used at Schlumberger, and confidential information on those devices, as well as "[c]onsequential damages that flow from use of Schlumberger confidential information."

App.—Houston [1st Dist.] 2008, pet. denied). Taking all pleadings and evidence in the light most favorable to Schlumberger, we hold that Schlumberger has demonstrated by "clear and specific evidence" a prima facie case that it is entitled to actual damages and, with respect to Schlumberger information or material still in Rutherford's possession, specific performance of the Patent and Confidential Information Agreement.

In summary, we hold that Schlumberger proved, by clear and specific evidence, a prima facie case supporting its breach-of-contract claim. Accordingly, we hold that the trial court did not err by denying Rutherford's TCPA motion to dismiss Schlumberger's breach-of-contract claim. We overrule Rutherford's sole issue on appeal.

## Conclusion

We lack jurisdiction over Schlumberger's interlocutory appeal of the portion of the trial court's order granting Rutherford's motion to dismiss as to Schlumberger's misappropriation, conversion, breach of fiduciary duty, and Texas Theft Liability Act claims. We therefore dismiss that appeal. We hold that the trial court did not err by denying Rutherford's TCPA motion as to Schlumberger's breach-of-contract claim, and we therefore affirm that portion of the order.


Michael Massengale
Justice

Panel consists of Chief Justice Radack and Justices Higley and Massengale.

29